**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DANIEL TEPPER, LILIAN FITZGERALD, and GWENDOLYN CROCKRAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE QUAKER OATS COMPANY,

Defendant.

Case No. 1:24-cv-2055

Judge Mary M. Rowland

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Daniel Tepper, Lilian Fitzgerald, and Gwendolyn Crockran ("Plaintiffs") have sued The Quaker Oats Company ("Defendant" or "Quaker"), alleging unjust enrichment and violations of multiple state consumer fraud and deceptive business practice laws, the Illinois Consumer Fraud and Deceptive Business Practices Act, the New York Consumer Law for Deceptive Acts and Practices, and the New York Consumer Law for False Advertising. For the reasons stated herein, Defendant's motion to dismiss Plaintiffs' Amended Class Action Complaint [20] is granted.

## I. Background

The following factual allegations taken from Plaintiffs' Amended Class Action Complaint (the "Complaint") [17] are accepted as true for the purposes of the motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Quaker sells a variety of oat-based products (the "Products") that Quaker markets as being made

with healthy "whole grains," including through a yellow "Whole Grain Stamp." [17] ¶ 2.[1] The following is an example of how Quaker markets the Products:

[17-1] at 23. According to Plaintiffs, Quaker's promotion of the whole grains in its Products as healthy is misleading given the presence (or risk) of chlormequat, a harmful chemical pesticide that carries a risk of adverse health impacts, in the Products. [17] ¶¶ 1-2. Plaintiffs allege that they "relied on the packaging in making . . . purchases, including that the Products were healthy because they were made with 'whole grain.'" [17] ¶¶ 8-10. Plaintiffs also allege that they would not have purchased the Products, or they would have paid less than they did, if they had known about the

[1] "Products" refers to the following Quaker products: Quaker Old Fashioned Oats; Quaker Instant Oatmeal Maple & Brown Sugar; Quaker Oatmeal Squares Honey Nut; Quaker Oatmeal Squares Brown Sugar; Quaker Simply Granola Oats, Honey & Almond; and Quaker Chewy Dark Chocolate Chunk Granola Bars. [17] ¶ 19.

presence (or risk) of dangerous chlormequat in the Products that made the Products worth less. [17] ¶¶ 74, 97, 113, 130.

In their Complaint, Plaintiffs incorporate by reference several studies, reports, and federal statutes involving chlormequat.[2] Plaintiffs refer to a peer-reviewed study by the Environmental Working Group ("EWG Study") that showed the presence of chlormequat in certain oat-based foods sold in the United States, including the Products, with the highest amount of chlormequat found in Quaker Old Fashioned Oats at 291 parts per billion ("ppb") or .291 parts per million ("ppm"). [17] ¶¶ 18-19. According to the Environmental Working Group, chlormequat is "linked to reproductive and developmental problems in animal studies which suggest similar harm to humans." [17] ¶ 21. Plaintiffs also refer to other studies involving chlormequat's impact on animals that, according to Plaintiffs, "raise obvious safety concerns for humans." [17] ¶ 22.

Chlormequat is banned from use on oats or any other food products grown in the United States. [17] ¶ 23 (citing 40 C.F.R. § 180.698 n.2). However, the United States Environmental Protection Agency ("EPA") allows imports of oats and oat-based foods containing chlormequat. [17] ¶ 23 (citing 40 C.F.R. § 180.698 n.2). The EPA set the tolerance for imported chlormequat at 40,000 ppb or 40 ppm. 40 C.F.R. § 180.698. Quaker does not disclose on the packaging where it obtains the oats it uses

[2] "It is well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (cleaned up).

in the Products or whether it tests the Products to determine the amount of chlormequat in them. [17] ¶ 23.

Following news of the EWG Study, some consumers left comments on Quaker's website indicating that they were upset that the Products contained (or risked containing) chlormequat. [17] ¶ 49. Plaintiffs' counsel conducted a survey of consumers that Plaintiffs allege confirms that the vast majority of consumers do not expect products containing oats to contain pesticide, believe the words "whole grains" on the Products' packaging indicate the food is healthy and do not indicate that the food contains chlormequat, and, if the Products contained, or risked containing, even a small amount of chlormequat, would find it important or very important to their purchasing decisions. [17] ¶¶ 50-51, 55.

Plaintiffs are residents of Illinois and New York. [17] ¶¶ 8-10. Plaintiffs bring claims against Quaker on behalf of a putative multi-state class that includes all persons who, during the applicable statute of limitations period, purchased the Products in California, Illinois, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal and/or household use. [17] ¶ 56. Plaintiffs also bring claims against Quaker on behalf of classes from their respective states. [17] ¶¶ 57-58. In Count I, Plaintiffs allege violations of multiple state consumer fraud and deceptive business practice laws on behalf of the multi-state class; in Count II, in the alternative to Count I, Plaintiff Crockran alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of the Illinois class; in Counts III and IV, in the alternative to Count I, Plaintiffs Tepper and Fitzgerald allege on

behalf of the New York class violations of the New York Consumer Law for Deceptive Acts and Practices and the New York Consumer Law for False Advertising, respectively; and in Count V, Plaintiffs allege unjust enrichment on behalf of all classes. [17] ¶¶ 67-142. Plaintiffs seek monetary damages and injunctive relief, among other things. [17]. Quaker moves to dismiss all of Plaintiffs' claims. [20].

**Standard**

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)).

**II. Analysis**

Quaker makes several arguments for dismissal of the Complaint, including that (1) Plaintiffs lack Article III standing, (2) the claims are preempted by federal law, and (3) Plaintiffs fail to state a plausible claim for consumer deception. Because

Plaintiffs lack Article III standing, which is fatal to all of Plaintiffs' claims, the Court will only address Defendant's standing argument.

### A. Article III Standing

"In evaluating a challenge to subject matter jurisdiction, the court must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Here, Quaker argues Plaintiffs fail to sufficiently allege a basis for subject matter jurisdiction which raises a facial challenge. *See id.* In this context courts "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

To establish Article III standing, a plaintiff must demonstrate that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146,1151 (7th Cir. 2020). An "injury in fact" is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339.

Quaker argues Plaintiffs lack Article III standing because they received what they bargained for and failed to allege a concrete injury. [20] at 19-20. In support of its argument, Quaker asserts that Plaintiffs' "subjective belief that trace amounts of chlormequat in Quaker products are dangerous is insufficient to plead a 'concrete' injury-in-fact." [20] at 20 (citing *Spokeo*, 578 U.S. at 339-40). Plaintiffs argue that Quaker misstates the law and cites to *Askin v. Quaker Oats Co.*, 818 F. Supp. 2d 1081, 1084 (N.D. Ill. 2011). [23] at 20.

In *Askin*, the plaintiff alleged that the defendant's statements on its packages and in its marketing campaigns that its products contained "0 grams trans fat," were "wholesome" and "heart healthy," and constituted nutritious "smart choices made easy," were misleading because the products contained highly unhealthy, unwholesome artificial trans fat. *Askin v. Quaker Oats Co.*, 818 F. Supp. 2d 1081, 1083 (N.D. Ill. 2011). Defendant argued that the plaintiff's premise for establishing Article III standing—that he paid a premium for Quaker's products because he believed they contained zero grams of trans fat—did not describe an injury-in-fact because plaintiff's standing argument relied on a health concern that was hypothetical at best given the insignificant amounts of trans fat in the products. *Id.* at 1083-84. The *Askin* court disagreed, stating that plaintiff "alleges that although he has not been physically harmed by [defendant's] products, he paid more for those products than he would have had he known they contain[ed] an ingredient he was *determined to avoid* because of its known health risks [and that] price differential represents a concrete injury-in-fact." *Id.* (emphasis added). The *Askin* court distinguished cases the defendant relied on where the plaintiffs "lack[ed] a claim that the plaintiffs were lured into buying the accused product based on a representation that an ingredient was not present in the product, when in fact it was." *Id.* at 1085. Here, Plaintiffs do not assert that the Products' packaging contained statements like "zero levels of chlormequat" or "zero levels of pesticides." As a result, *Askin* is distinguishable and does not support Plaintiffs' standing argument.

Plaintiffs also compared the facts of this case to *In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 2023 WL 3585759 (N.D. Ill. May 22, 2023). [23] at 21. In *Abbott*, the plaintiff alleged that certain Abbott infant formula products contained heavy metals which was not disclosed in the labeling for the products, the effects of heavy metals are latent, there is no safe level of heavy metals in infant formula, and she would not have purchased or would not have paid the price premium for Abbott's infant formula had she known the products contained or had a material risk of containing heavy metals. *In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 2023 WL 3585759, at *1-2, 5-6 (N.D. Ill. May 22, 2023). Abbott argued the plaintiff did not allege a cognizable economic injury because the heavy metal levels reported in the complaint would be lower if the prepared formula, which would have been diluted with water, were tested, and that those lower levels would have been significantly below the U.S. Food and Drug Administration's ("FDA") guidance for analogous products and therefore safe. *Id.* at *5. The *Abbott* court stated that Abbott's contention raised a factual dispute regarding the level at which heavy metal contamination in food products intended for infants becomes dangerous and found that plaintiff plausibly alleged that even low levels of heavy metals were harmful. *Id.* at *6. The court found support for plaintiff's position in a draft FDA guidance that defendant cited to that stated, "even low-level chronic exposure can be hazardous over time . . . no safe level of lead exposure has been identified for protecting children's health." *Id.*

When applying *Abbott* to this case, Plaintiffs argue that "Defendant's reliance on the EPA's supposed determination of 'safe' chlormequat levels only applicable to imported oats is an issue of fact given there is no determination that all the oats are imported and Plaintiffs plausibly allege dangers of chlormequat based on studies and reports." [23] at 21. The Court disagrees.

The facts in this case are distinguishable from the facts in *Abbott* where the plaintiff plausibly alleged that heavy metals were harmful at *any level* and the defendant could not argue that the product at issue was below the threshold set by the FDA for *analogous products* without manipulating the product. *See Abbott*, 2023 WL 3585759, at *5-6 (emphasis added). In the present case, the EPA set the tolerance for chlormequat in imported oats at 40,000 parts per billion or 40 parts per million. 40 C.F.R. § 180.698. The Court agrees with Plaintiffs' assertion that Quaker's statement in its motion that it sources oats from Canada cannot be considered. [23] at 8. However, Plaintiffs have not plausibly alleged that the EPA's regulations establishing safe levels of chlormequat in imported oats do not also apply to oats grown in the United States for the purposes of determining whether the level of chlormequat in a product is safe or unsafe. The EWG Study, and testing conducted by Plaintiffs' counsel, identified chlormequat in the Products at an amount that is *significantly below* the tolerance level set by the EPA. [17] ¶ 19. Indeed, the highest amount of chlormequat that Plaintiffs allege was found in the Products is 291 ppb or .291 ppm—.7% of the EPA's tolerance level for chlormequat. [17] ¶ 19. As a result,

the only reasonable inference is that whether the oats in the Products were imported or grown in the United States, the levels of chlormequat in the Products were safe.

Plaintiffs' allegations about the harm that chlormequat poses to humans is hypothetical. *See Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) ("[Plaintiff's] argument that she was misled into purchasing unsafe lipstick products is belied by the FDA's report finding that the lead levels in the [d]efendants' lipsticks were not dangerous and therefore did not require warnings. Moreover, [plaintiff] concedes that she has suffered no adverse health effects from using the lipsticks. [Plaintiff] therefore has asserted only a subjective allegation that the trace amounts of lead in the lipsticks are unacceptable to her, not an injury-in-fact sufficient to confer Article III standing."). Because Plaintiffs failed to allege an injury-in-fact, there is no Article III standing. In light of the Court's finding that Plaintiffs failed to allege Article III standing, the Court will not evaluate Defendant's other arguments, including Defendant's argument that Plaintiffs failed to state a claim for consumer deception.

## III. Conclusion

For the stated reasons, Defendant's motion to dismiss Plaintiffs' Amended Class Action Complaint [20] is granted. The Amended Complaint is dismissed with prejudice.

E N T E R:

Dated: March 18, 2025

MARY M. ROWLAND
United States District Judge